IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

DEBBIE HOWARD and LORA L.          )
NEWSON, on behalf of themselves    )
and all similarly situated         )
persons,                           )
                                   )
     Plaintiffs,                   )
                                   )   No. <u>06-2833</u> Ml/P
v.                                 )
                                   )
WILKES & McHUGH, P.A., a           )
Florida professional              )
association, JAMES L. WILKES,      )
II, and TIMOTHY C. McHUGH,         )
                                   )
     Defendants.                   )

---

**REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION TO DISQUALIFY
COUNSEL FOR PLAINTIFFS**

---

Before the court is the Motion to Disqualify Counsel for Plaintiffs filed by defendants Wilkes & McHugh, P.A. ("the Wilkes firm"), James L. Wilkes, and Timothy C. McHugh (D.E. 45). The motion was referred to the Magistrate Judge for a report and recommendation. Based on the entire record in this case, including the memoranda of law submitted by the parties and accompanying exhibits and declarations,[1] the court submits the following

---

[1]On August 23 and 24, 2007, the court entered orders denying defendants' Motion to Strike and Motion to Strike the Declaration of Lucian T. Pera (D.E. 101 and 102), which relate to declarations filed by William Watson, Frank Burns, Lora Newson, and Lucian Pera in response to defendants' motion to disqualify. For purposes of this report and recommendation, the court has considered these

proposed findings of fact and conclusions of law, and recommends that the motion to disqualify counsel for plaintiffs be DENIED.

## I.   PROPOSED FINDINGS OF FACT

**A.   Procedural History and Allegations in First Amended Complaint**

This case arises from the Wilkes firm's representation of plaintiffs Debbie Howard and Lora Newson in lawsuits filed on their behalf by the Wilkes firm against nursing home facilities.  The Wilkes firm is a Florida-based law firm that has represented numerous plaintiffs in nursing home neglect and abuse cases in Tennessee and elsewhere.  Defendants James L. Wilkes, II and Timothy C. McHugh are the founding partners of the firm.  (First Amd. Compl. ¶¶ 8-9).

In 1998, the Wilkes firm began advertising its services in Tennessee.  (Id. ¶¶ 11, 29).  In or about May of 1999, Debbie Howard contacted the Wilkes firm for representation in connection with the death of her grandmother, Bertha Lee Baker, who she believed had died as a result of improper care provided by Whitehaven Manor nursing home.  (Id. ¶ 33).  The Wilkes firm, in association with a local Tennessee firm, Spencer & Martin, P.L.C.[2] (the "Spencer firm"), opened an estate in Shelby County Probate

---

declarations in a manner consistent with the orders denying defendants' motions to strike.

[2]In 1999, the Wilkes firm had not yet established its Tennessee office.  The firm first opened its Tennessee office in February of 2000.  (Id. ¶¶ 33, 36).

Court in the name of Bertha Lee Baker, with Howard serving as its personal representative. (Id. ¶ 34). In September of 1999, the Wilkes firm, through the Spencer firm, filed an action on behalf of the estate in the Circuit Court of Shelby County against Whitehaven Manor nursing home and other defendants, styled The Estate of Bertha Lee Baker by and through Debbie Howard, Personal Representative v. Whitehaven Healthcare, Inc. et al., Cause No. 304421 T.D.-8 ("Baker Lawsuit"). (Id. ¶ 35). Howard's Second Amended Complaint asserted various claims, including claims for negligence, violations of the Tennessee Medical Malpractice Act, Tenn. Code Ann. §§ 29-26-115 et seq. ("TMMA"), violations of the Tennessee Adult Protection Act, Tenn. Code Ann. §§ 71-6-101 et seq., and other state law claims. (Ex. A. to First Amd. Compl).

In connection with the Baker Lawsuit, Howard entered into a fee agreement with the Wilkes firm, in which the Wilkes firm would receive a contingency fee of 40% of any gross recovery in the case. (First Amd. Compl. ¶ 42). In September of 2002, the Wilkes firm negotiated a settlement with the nursing home's insurance carrier, and pursuant to the fee agreement, received 40% of the gross settlement amount as its fee. (Id. ¶ 54).

In 2005, Eddie Newson, a relative of plaintiff Lora Newson, contacted the Wilkes firm for representation in connection with the medical care and treatment provided to Lora Newson's grandmother, Lillie Newson, at the Allenbrooke Nursing and Rehabilitation

-3-

Center. (Id. ¶ 43). The Wilkes firm agreed to take the case, and in September of 2004, the firm filed a complaint in the Circuit Court of Shelby County styled Eddie Newson, as next friend of Lillie Newson, an incapacitated person v. Allenbrooke Nursing and Rehabilitation Center, L.L.C., et al., Cause No. CT-005666-04, Div. 9 ("Newson Lawsuit"). (Id.). Newson's complaint asserted claims similar to those brought in the Baker Lawsuit. (Ex. C to First Amd. Compl.). In June of 2006, after Lillie Newson had died and Lora Newson was identified as her sole heir, the Wilkes firm entered into a fee agreement with plaintiff Newson and Eddie Newson in connection with the Newson Lawsuit. (First Amd. Compl. ¶ 46). Like Howard's agreement, Newson's agreement provided that the Wilkes firm would receive a 40% contingency fee on any gross recovery. (Id.). In August of 2006, the Wilkes firm negotiated with the nursing home's insurance carrier to settle all of Newson's claims. (Id. ¶ 54). Pursuant to the fee agreement, the Wilkes firm collected 40% of the gross settlement amount in fees. (Id.).

On December 7, 2006, Baker filed a class action complaint against the defendants based on their alleged violations of the TMMA.[3] Specifically, the complaint identifies the proposed class as follows:

> From December 7, 1999 to the present, Plaintiffs and all of similarly situated persons to whom Defendants,

---

[3] With leave of court, Newson was later permitted to join the lawsuit as a plaintiff.

> pursuant to the terms of an employment contract, have assessed (or intend to assess) a contingency fee in excess of 33 1/3% against their respective shares of the gross settlement proceeds paid (or to be paid) in connection with any action filed and/or prosecuted in a Tennessee State or Federal Court by Defendants where a Tennessee Medical Malpractice Act cause of action was asserted.

(Id. ¶ 70).  Count I of First Amended Complaint claims that the defendants' fee agreements with Baker, Newson, and other similarly situated Tennessee clients violate the TMMA's fee cap of 33 1/3%.[4] Tenn. Code Ann. § 29-26-120.  The defendants' alleged failure to comply with the TMMA fee cap, failure to disclose the existence of the cap to their clients, and failure to seek proper judicial approval of the fee itself purportedly violate the TMMA, the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-104, and Tennessee common law.  Count II seeks punitive damages and Count III seeks declaratory and injunctive relief.

In Counts IV and VII, plaintiffs claim that by charging excessive fees and expenses, as well as by failing to disclose the statutory fee cap or the extent of their expenses to their clients,

---

[4]Tenn. Code Ann. § 29-26-120 provides as follows:

> Compensation for reasonable attorneys' fees in the event an employment contract exists between the claimant and claimant's attorney on a contingent fee arrangement shall be awarded to the claimant's attorney in a malpractice action in an amount to be determined by the court on the basis of time and effort devoted to the litigation by the claimant's attorney, complexity of the claim and other pertinent matters in connection therewith, not to exceed thirty-three and one third percent (33 1/3 %) of all damages awarded to the claimant.

the defendants breached their fiduciary duties and duties of care owed to the class.  Counts V alleges unjust enrichment and Count VI seeks imposition of a constructive trust.  Finally, in Count VIII, plaintiffs claim that Mr. Wilkes and Mr. McHugh are individually liable to the class for implementing the contingency fee policies at the Wilkes firm and for their failure to adequately supervise and train their attorneys regarding the TMMA's fee cap.

**B.   Defendants' Motion to Disqualify**

The plaintiffs in this case are represented by attorneys William F. Burns and Frank L. Watson, who formed the law firm of Watson Burns, PLLC (the "Watson firm") in 2005.  (Burns Decl. ¶ 4). Prior to forming this law firm, from May of 2001 to March of 2005, Mr. Burns worked as an associate with the law firm of Glassman, Edwards, Wade & Wyatt, P.C. (the "Glassman firm").  According to defendants, the Glassman firm, at various times, represented defendants in fourteen nursing home abuse cases filed by plaintiffs who were represented by the Wilkes firm.[5]   (Defs. Mot. to Disqualify at 5, Ex. 1).  However, Mr. Burns did not participate in any of these fourteen cases.

Mr. Watson previously worked at the law firm of Baker, Donelson, Bearman, Caldwell & Berkowitz, PC ("Baker Donelson"),

---

[5]Exhibit 1 attached to defendants' motion to disqualify lists these fourteen cases.  However, the exhibit does not identify which defendant(s) the Glassman firm represented, nor does it identify the dates that the Glassman firm represented these defendants.

which at various times represented nursing home defendants in at least seven lawsuits filed by plaintiffs who were represented by the Wilkes firm.[6]   (Defs. Mot. to Disqualify at 6, Ex. 3). However, Mr. Watson did not participate in any of those lawsuits, and neither the Watson firm nor Mr. Watson has ever represented any nursing home or nursing home insurance carrier (collectively "nursing home clients").   (Burns Decl. ¶ 2; Watson Decl. ¶ 7).

In the present motion, the defendants ask the court to disqualify the Watson firm from representing the plaintiffs based on the "previous representation of nursing home defendants by Plaintiffs' counsel and various actions undertaken by Plaintiffs' counsel in prosecuting this case . . . . ."   (Defs. Mot. to Disqualify at 3).   First, the defendants claim that the Watson firm should be disqualified based on Messrs. Burns and Watson's prior employment with law firms that represented defendants in nursing home abuse cases.   With respect to Mr. Burns, the defendants point to the fourteen cases in which the Glassman firm represented defendants against claims brought by plaintiffs represented by the Wilkes firm.   In addition, in another case, <u>Gene A. Patzsch,</u> <u>natural son of Catherine Patzsch, for the use and benefit of the</u> <u>Estate of Catherine Patzsch, and for the use and benefit of the</u> <u>wrongful death beneficiaries of Catherine Patzsch v. American</u>

---

[6]Exhibit 3 does not identify which defendant(s) Baker Donelson represented or the dates that the firm represented these defendants.

<u>Health Centers, Inc., et al.</u>, Cause No. CT-002355-00-3, ("Patzsch Lawsuit"), defendants state that Mr. Burns was listed as counsel of record for the defendants.  Further, the defendants identify four other cases in which "Burns also represented other defendants in cases involving nursing home residents who were not represented by [the Wilkes firm] . . . ."[7]  With respect to Mr. Watson, the defendants assert that "[t]he Baker Donelson firm has defended against claims brought by nursing home residents, their estates, surrogates or successors in at least 7 cases in Tennessee filed by [the Wilkes firm]." (Defs. Mot. to Disqualify at 6).  Based on these prior representations of nursing home clients, defendants claim that the Watson firm's representation of plaintiffs in this case violate Tennessee Rule of Professional Conduct ("TRPC") 1.7 because "[t]he relief sought by Mr. Burns and Mr. Watson reveals that their obligations of fidelity continue to their and their former firm's nursing home clients, and not to the benefit of the victims of nursing home abuse that they propose to represent." (Defs. Mot. to Disqualify at 7).

Second, the defendants allege that the Watson firm has

_____

[7]These cases include <u>Holloway v. Graceland Nursing Center</u>, et al., Cause No. CT-00515-02; <u>Harney v. Graceland Nursing Center, et al.</u>, Case No. CT-000516-02; <u>Allen v. Sycamore Care and Rehab. Center, et al.</u>, Cause No. CT-000604-02; and <u>Lee v. Graceland Nursing Center, et al.</u>, Cause No. CT-00818-02. (Defs.' Mot. to Disqualify at 5). Because the plaintiffs in these four cases were not represented by the Wilkes firm, these plaintiffs would not be included in the class.

violated TRPC 4.2 by contacting Lora and Eddie Newson, who are current clients of the Wilkes firm, regarding the present litigation. (Id. at 9-10).  Third, the defendants contend that the Watson firm has violated TRPC 4.4 "by attempting to intervene in the relationships between [the Wilkes firm] and its clients to impose the nursing home defendants' view of the law upon [the Wilkes firm's] clients, which is ultimately detrimental to the interest of those clients." (Id. at 9).  Defendants argue that the Watson firm is attempting to "foment discontent with the firm and to interfere with the firm's relationships with its clients" by allegedly placing an internet advertisement promoting their lawsuit and soliciting clients of the Wilkes firm on the website www.lawyersandsettlements.com.

Fourth, the defendants assert that the Watson firm's ties to the nursing home industry is further evidenced by its decision to retain attorney Lucian Pera as an ethics expert, because Mr. Pera's law firm, Adams and Reese, LLP ("Adams and Reese") is currently opposing counsel in four cases filed by the Wilkes firm against nursing home defendants in Tennessee.  The defendants allege that the Watson firm's relationship with Mr. Pera is even more problematic because Mark E. Norris, an attorney at Adams and Reese and a Tennessee State Senator, recently introduced a bill in the Tennessee Senate that would restrict and cap non-economic damages for victims of nursing home abuse, limit damages for medical costs,

and further restrict the amounts of attorney's fees in the event of settlement, arbitration, or judgment. (Defs. Mot. to Disqualify at 12).

Fifth, the defendants claim that Mr. Burns will be a material witness in the current case and is "thus precluded from acting as counsel in the litigation." (Id. at 13). According to the defendants, "[a]s counsel for the nursing home defendants in the Patzsch case, Mr. Burns is a material witness to the order of the litigation, the claims made and the settlement agreement ultimately reached." (Id. at 13).

Sixth, the defendants allege that the Watson firm has violated TRPC 8.4 by "encouraging" others to violate Canon 3 of the Tennessee Code of Judicial Conduct ("TCJC"). According to the defendants, Harold G. Walter, an expert witness retained by the plaintiffs on probate court practice and procedure, engaged in what the defendants call "ex parte communications" with Shelby County Probate Judge Robert Benham and retired Probate Judge Donn Southern in preparing and drafting his declaration filed as part of plaintiffs' response in opposition to defendants' motion to dismiss. The defendants assert that these discussions were unethical because the judges commented on court proceedings, because Walter himself is a specially appointed Probate Judge in Shelby County, and because the Watson firm knowingly assisted the judges in violating the TCJC and, in doing so, engaged in

"manipulation of members of the judiciary."

Seventh, the defendants argue that the Watson firm improperly contacted the Wilkes firm's clients and encouraged them to discuss confidential terms of their settlement agreements, in violation of TRPC 4.4 and 1.7.  Finally, the defendants claim that Mr. Watson improperly contacted attorney Blair Evans in violation of TRPC 4.4. Defendants contend that, as a former associate of the Wilkes firm and plaintiffs' counsel of record in the Baker Lawsuit, Ms. Evans was privy to attorney-client privileged information, work product, counsels' mental impressions, and trade secrets.  (Defs. Mot. to Disqualify at 17).  According to the defendants, Mr. Watson called Ms. Evans and asked her for information about the Wilkes firm and its clients.  The defendants allege that Mr. Watson attempted to solicit privileged and confidential information about the Wilkes firm's clients and settlement agreements from Ms. Evans.

## II.  PROPOSED CONCLUSIONS OF LAW

### A.  Legal Standards

A motion to disqualify is the proper mechanism for bringing an alleged breach of ethical rules to the attention of the court. Bartech Indus., Inc. v. Int'l Baking Co., Inc., 910 F. Supp. 388, 392 (E.D. Tenn. 1996).  Motions to disqualify require the court to exercise its judgment "with an eye toward 'upholding the highest ethical standards of the profession, protecting the interest of the litigants in being represented by the attorneys of their choosing,

-11-

protecting the loyalty and confidences [of clients], and the overriding societal interests in the integrity of the judicial process.'" McKinney v. McMeans, 147 F. Supp. 2d 898, 900 (W.D. Tenn. 2001) (quoting Bartech, 910 F. Supp. at 392).

Motions to disqualify are disfavored, however, as disqualification is a drastic measure that "courts should hesitate to impose except when absolutely necessary." In re Valley Vulcan Mold Co., 237 B.R. 322, 337 (6th Cir. B.A.P. 1999). Although the power to disqualify an attorney is "incidental to all courts, and is necessary for the preservation of decorum, and for the respectability of the profession," a violation of the rules "does not automatically necessitate disqualification of an attorney." El Camino Res., Ltd. v. Huntington Nat'l Bank, No. 1:07-cv-598, 2007 WL 2710807, at *10 (W.D. Mich. Sept. 13, 2007); see also Eon Streams, Inc. v. Clear Channel Commc'ns, Inc., No. 3:05-CV-578, 2007 WL 954181, at *2 (E.D. Tenn. March 27, 2007). Disqualification is an "extreme sanction," and an attorney should only be disqualified if there is a "'reasonable possibility that some specifically identifiable impropriety' actually occurred, and where the public interest in requiring professional conduct by an attorney outweighs the competing interest of allowing a party to retain counsel of his choice." El Camino, 2007 WL 2710807, at *10 (quoting Woods v. Covington County Bank, 537 F.2d 804, 810 (5th Cir. 1976)). A court should view a motion to disqualify "with

extreme caution because it can easily be misused as a harassment technique." <u>Eon Streams</u>, 2007 WL 954181, at *3; <u>see also</u> Tenn. Sup. Ct. R. 8, TRPC 1.7, Comment 19 ("Such an objection should be viewed with caution, however, for it can be misused as a technique of harassment."). The party seeking disqualification has the burden of proving that opposing counsel should be disqualified. <u>McKinney</u>, 147 F. Supp. 2d at 900.

A federal court derives its authority to disqualify attorneys from two sources: the local rules of the court[8] and the standards developed under federal law. <u>Id.</u> Generally, federal law has adopted the ethical rules promulgated by the Supreme Court in which the federal court sits or announced by the national profession and embodied in the ABA Model Rules of Professional Conduct and the ABA Code of Professional Responsibility. <u>Id.</u>

As an initial matter, the Watson firm argues that the defendants do not have standing to bring a motion to disqualify because the defendants are not current or former clients of the Watson firm. <u>See</u> <u>Frey v. Prior</u>, No. 91-3567, 1991 WL 253557, at *1 (6th Cir. Nov. 27, 1991) (holding that plaintiff "lacks standing to assert a claim of conflict of interest against either Mooney or

---

[8]Although Local Rule 83.1(e) requires that all attorneys practicing before this court shall comply with the Code of Professional Responsibility, the Tennessee Supreme Court adopted the Rules of Professional Conduct on August 27, 2002, effective March 1, 2003. <u>Eon Streams</u>, 2007 WL 954181, at *3 n.4. These rules were last amended on April 1, 2004.

BFCA because no attorney client relationship existed between Frey and Mooney or BFCA."); <u>see also</u> <u>In re Sandahl</u>, 980 F.2d 1118, 1121-22 (7th Cir. 1992) (granting writ of mandamus and vacating the district court's order to disqualify defense counsel because the plaintiff was not a former client of defense counsel and thus did not have standing to bring the motion to disqualify); <u>O'Connor v. Jones</u>, 946 F.2d 1395, 1400-01 (8th Cir. 1991) (affirming district court's order denying motion to disqualify counsel due to plaintiff's lack of standing); <u>In re Yarn Processing Patent Validity Litig.</u>, 530 F.2d 83, 88 (5th Cir. 1976) (explaining that "[a]s a general rule, courts do not disqualify an attorney on the grounds of conflict of interest unless the former client moves for disqualification."); <u>FMC Techs. Inc. v. Edwards</u>, 420 F. Supp. 2d 1153, 1156-57 (W.D. Wash. 2006) (stating that the majority view "is that only a current or former client of an attorney has standing to complain of that attorney's representation of interests adverse to that current or former client"); <u>The White Family Cos., Inc. v. Dayton Title Agency, Inc.</u>, 284 B.R. 238, 245 (S.D. Ohio 2002) (holding that, in absence of Sixth Circuit precedent to the contrary, appellants did not have standing to seek disqualification of opposing counsel because they were not former clients); <u>Dawson v. City of Bartlesville</u>, 901 F. Supp. 314, 316 (N.D. Okl. 1995) (denying plaintiff's motion to disqualify because plaintiff was not a former client of opposing counsel); Tenn. Sup. Ct. R. 8, Scope

[6] ("The fact that a Rule is a just basis for a lawyer's self-assessment or for sanctioning a lawyer under the administration of a disciplinary authority does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule."). But see Wilson v. Morgan, 477 F.3d 326, 346 n.8 (6th Cir. 2007) (in declining to decide standing issue because neither party raised issue on appeal, the court observed that note 19 to TRPC 1.7 provides that opposing counsel may raise the conflict of interest question when the conflict is such as clearly to call in question the fair or efficient administration of justice); Colyer v. Smith, 50 F. Supp. 2d 966, 970 (C.D. Cal. 1999) (stating that Sixth Circuit follows the minority view that the Rules of Professional Responsibility provide a source of "'rules-based' standing in *attorneys* seeking to disqualify opposing counsel for ethical violations") (emphasis in original).[9]

---

[9]In Dana Corp. v. Blue Cross & Blue Shield Mut. of N. Ohio, 900 F.2d 882 (6th Cir. 1990), the Sixth Circuit stated that in deciding a motion to disqualify counsel, the court must determine whether (1) a past attorney-client relationship existed between the party seeking disqualification and the attorney it seeks to disqualify; (2) the subject matter of those relationships was/is substantially related; and (3) the attorney acquired confidential information from the party seeking disqualification. Id. at 889; see also McKinney, 147 F. Supp. 2d at 900 (citing Dana); In re Valley-Vulcan Mold Co., 5 Fed. Appx. 396, 401 (6th Cir. 2001) (citing Dana). Under Dana, the threshold requirement is the existence of an attorney-client relationship, which clearly is not satisfied in the present case as it is undisputed that the defendants (the party seeking disqualification) never had an attorney-client relationship with the Watson firm (the attorneys sought to be disqualified). Dana, however, does not expressly address the question of whether a party has standing to seek disqualification of an opposing

The court need not decide this issue, however, because even assuming, *arguendo*, that the defendants have standing to seek disqualification of the Watson firm, the court finds that none of the allegations of conflicts of interest and ethical violations raised by the defendants have any merit.

**B.   Disqualification Based on Prior Representation of Nursing Home Clients**

The court submits that Messrs. Burns and Watson's former law firms' representation of nursing home clients, Mr. Burns's prior representation of defendants in nursing home abuse cases that did not involve the Wilkes firm, and Mr. Burns's prior involvement in the Patzsch Lawsuit, do not either independently or in combination prohibit the Watson firm from representing the plaintiffs in the present litigation.   TRPC 1.7(b), upon which defendants' motion is based, provides in relevant part that "[a] lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, . . . ."[10]   Tenn. Sup. Ct. R. 8, TRPC

_____

party's counsel based on a conflict of interest where the party moving for disqualification is not a former or current client of the opposing party's counsel.

[10]Defendants do not argue that disqualification is warranted under TRPC 1.7(a), which provides that "[a] lawyer shall not represent a client if the representation of that client will be directly adverse to another client . . . ."  Tenn. Sup. Ct. R. 8, TRPC 1.7(a).  In any event, there is nothing to suggest that the Watson firm's representation of the plaintiffs would be "directly adverse" to any of their other current (or former) clients.

-16-

1.7(b).  For the reasons discussed below, the court finds that the record does not demonstrate that the Watson firm has any "responsibilities" to a nursing home client or the nursing home industry generally, nor is the Watson firm's current representation of plaintiffs in any way "materially limited" by its "responsibilities" to the nursing home clients or industry.

Likewise, the Watson firm's representation of the plaintiffs does not violate TRPC 1.9.[11]  TRPC 1.9 provides that

> (a)  A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client, unless the former client consents in writing after consultation.
>
> (b)  Unless the former client consents in writing after consultation, a lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter.
>
> (c)  Unless the former client consents after consultation, a lawyer who has formerly represented a client in a matter, or whose present or former firm has formerly represented a client in a matter, shall not thereafter:
>
>> (1)  use information relating to the representation to the disadvantage of the former client except as these Rules otherwise permit or require with respect to a client, or

---

[11]Although defendants do not cite or rely on TRPC 1.9 in their motion to disqualify, the court will nevertheless address the applicability of TRPC 1.9, as that rule applies to conflicts of interest involving a former client.

> when the information has become generally
> known; or
>
> (2) reveal information relating to the
> representation of the former client except as
> these Rules otherwise permit or require with
> respect to a client.

Tenn. Sup. Ct. R. 8, TRPC. 1.9.

First, although the defendants refer generally to Messrs. Burns and Watson's former clients as defendants in nursing home abuse cases, the defendants have not identified any of these former clients to whom either TRPC 1.7 or 1.9 might apply or to whom the Watson firm allegedly owes a "responsibility." Second, the present class action litigation is not "the same or a substantially related matter" to the former representation, as the present case relates to the legality of the fees and expenses that the Wilkes firm charged its clients whereas the former representation related to the defense of nursing homes in abuse and neglect cases. Third, the plaintiffs' interests are not "materially adverse" to or "materially limited" by the interests of these unidentified former nursing home clients. This class action does not seek to limit the number or types of claims that may be brought by nursing home abuse victims, but rather seeks to prevent the Wilkes firm from recovering contingency fees from their clients in excess of the 33 1/3% cap under the TMMA and to require the Wilkes firm to make those fee cap disclosures to its clients. (First Amd. Compl. ¶¶ 70-77). Lastly, the arguments raised by the defendants in their

motion relate to protecting the plaintiffs' interests, whereas it is apparent from the language of TRPC 1.9 that the rule is intended to protect the interests of the former clients – none of whom have sought to challenge the Watson firm's representation of the plaintiffs in this case.   Therefore, it is submitted that the motion to disqualify the Watson firm based on TRPC 1.7 and 1.9 should be denied.

## C.  Disqualification Based on TRPC 4.2 and 4.4

The court further submits that the Watson firm has not violated TRPC 4.2 by communicating with Lora Newson.[12]   In her declaration attached to plaintiffs' response to the motion to disqualify, Lora Newson states as follows:

> 2.   In or about June 2006, I executed a contingency fee agreement with [the Wilkes firm] to represent me, as the sole heir of the estate of my grandmother Lillie Newson, in a medical malpractice action against a nursing home that provided care and treatment of my grandmother.   A few months after I signed [the] agreement, [the Wilkes firm] settled the case and presented two settlement agreements to me, both of which I signed in August 2006. At the end of August, [the Wilkes firm] deducted a 40% contingency fee from the settlement proceeds.   I received the balance of the settlement proceeds less certain expenses.   I understand that the lawsuit against the nursing home was dismissed in November 2006.   Since the date of settlement, I have not had any further contact or communications with [the Wilkes firm] concerning the nursing home case.

---

[12]Defendants also argue generally in their motion to disqualify that the Watson firm improperly communicated with Eddie Newson. However, defendants do not describe in any detail the circumstances surrounding these alleged communications and why the communications were improper.

3. . . . I first learned of the filing of the lawsuit against [the Wilkes firm] . . . from my lawyer Gina Higgins of the law firm Higgins and Johnson, who represents me in another legal matter. Ms. Higgins referred me to the Watson Burns law firm . . . . After meeting with Ms. Higgins and the attorneys of Watson Burns, I decided to retain Watson Burns and authorized them to file suit against [the Wilkes firm] and the individual defendants in this matter on my personal behalf . . . . Watson Burns is my counsel of choice in this case.

(Lora Newson Decl. ¶¶ 2-3).

Rule 4.2 provides that "[i]n representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so." Tenn. Sup. Ct. R. 8, TRPC 4.2. The rule, however, applies only to communications "about the subject of the representation" with a represented person "in the matter." See United States v. Ford, 176 F.3d 376, 382 (6th Cir. 1999) (holding that "[s]ince prosecutors were investigating an offense other than the offense for which Defendant was indicted, the contact does not pertain to the 'subject matter of the representation' as Rule 4.2 states."). As explained by the Comments to TRPC 4.2,

[1] This Rules contributes to the proper functioning of the legal system *by protecting a person who has chosen to be represented by a lawyer in a matter against possible overreaching by other lawyers who are participating in the matter*, interference by those lawyers with the client-lawyer relationship, and the uncounseled disclosure of information relating to the representation.

[2]  This Rule applies to communications with any person, whether or not a party to a formal adjudicative proceeding, contract, or negotiation, *who is represented by counsel concerning the matter to which the communication relates*. . . .

[5]  *This Rule does not prohibit communication with a represented person, or an employee or agent of such a person, concerning matters outside the subject matter of the representation*.  For example, the existence of a controversy between a government agency and a private party, or between two private parties, does not prohibit a lawyer for either from communicating with nonlawyer representatives of the other regarding a separate matter, such as additional or different unlawful conduct not within the subject matter of the representation.  *Nor does this Rule preclude a lawyer from communicating with a person who seeks a second opinion about a matter in which the person is represented by another lawyer*. . . .

Tenn. Sup. Ct. R. 8, TRPC 4.2, Comments 1,2,5 (emphasis added). Here, the matter for which the Wilkes firm represented Lora Newson (the nursing home abuse case involving Lora Newson's grandmother) is different from the matter for which the Watson firm communicated with Ms. Newson (the legality of the fees and expenses charged by the Wilkes firm).  Under the defendants' interpretation of the rule, a client could never hire another attorney to represent her in a legal malpractice case or fees litigation against her former attorney because new counsel would necessarily violate TRPC 4.2. Such communications are not barred by the rule.

In addition, the Watson firm has not violated TRPC 4.4 by "impos[ing] the nursing home defendants' view of the law upon [the Wilkes firm's] clients" or by placing an advertisement promoting their lawsuit and soliciting clients of the Wilkes firm on the

-21-

website   www.lawyersandsettlements.com.   TRPC 4.4 states in pertinent part that "[i]n representing a client, a lawyer shall not: (a) use means that have no substantial purpose other than to embarrass, delay, or burden a third person or knowingly use methods of obtaining evidence that violate the legal rights of such a person." Tenn. Sup. Ct. R. 8, TRPC 4.4. With respect to the defendants' argument that the Watson firm has violated TRPC 4.4 by "imposing" the nursing home industry's views upon the plaintiffs to their detriment, this argument is meritless.  The court does not see how the Watson firm's actions can be construed as having no substantial purpose or as obtaining evidence that violate the legal rights of third parties.

Additionally, neither the Watson firm nor anyone on the firm's behalf placed any advertisement concerning this lawsuit on www.lawyersandsettlements.com or on any other website. (Watson Decl. ¶ 12).  In addition to Watson's declaration, the Watson firm submitted a declaration from Scott Wurtele, the owner of Online Legal Marketing Ltd. ("OLM"), which operates the website www.lawyersandsettlements.com. (Wurtele Decl. ¶ 1).  In his declaration, Wurtele states as follows:

> 1.  . . . . OLM's principal activity is researching and producing an on-line information digest which focuses primarily on class action and personal injury litigation.

> 2.  On January 15, 2007, OLM posted information related to the above-styled class action lawsuit filed against Wilkes & McHugh, P.A. and provided potential class members an opportunity to register a complaint.  This

information was prepared by OLM employees from publicly
available court filings and was placed on OLM's website
by these employees.  At no time did [the Watson firm or
their agents or employees] participate in the posting of
this information.  In particular, they did not request or
solicit OLM to create any website posting nor was OLM
notified of the filing of the Wilkes & McHugh, P.A. class
action by Watson Burns (nor its individual attorneys or
agents).  In fact, Watson Burns has never requested that
OLM post anything on its internet site related to Wilkes
& McHugh, P.A. or any other matter.  As a result, Watson
Burns has not placed any type of advertisement or other
information on www.lawyersandsettlements.com nor any
other website owned by OLM. . . .

4.   Prior to a telephone conversation with [Mr. Burns],
on March 5, 2007 concerning the above facts, OLM has
never had any contact or relationship with Watson Burns
. . . .  Additionally, prior to March 5, 2007, no other
attorney, including but not limited to, any attorney
purporting to be acting on behalf of Wilkes & McHugh,
P.A., James Wilkes, or Timothy McHugh, has contacted OLM
inquiring about the status of the Wilkes McHugh posting
or attempting to determine if Watson Burns was actually
responsible for this posting.

(Wurtele Decl. ¶¶ 1, 2, 4).  Thus, even assuming, *arguendo*, that

the website posting somehow implicated TRPC 4.4, because the Watson

firm was not involved in placing any advertisement or maintaining

the website, the firm could not and did not violate that rule.[13]

Equally meritless is defendants' argument that Mr. Pera, the

---

[13]In fact, on March 2, 2007, when Sean Cronin, an attorney with the
Greenberg Traurig law firm that represents the defendants,
contacted Mr. Watson to consult under Local Rule 7.2(a)(1)
regarding the motion to disqualify, Mr. Watson told Mr. Cronin that
the Watson firm had not done any advertising on the internet (or
anywhere else) and that he (Mr. Cronin) was incorrect about his
belief that the Watson firm was soliciting clients of the Wilkes
firm over the internet in an effort to add plaintiffs to this
action.  (Watson Decl. ¶ 13).  Despite receiving this information,
defense counsel apparently elected not to investigate further
regarding the basis of their allegations before filing this motion.

plaintiffs' expert witness on ethics, has been improperly influenced by the nursing home industry because his law firm, Adams and Reese, has represented nursing home clients and because Mark E. Norris, who is an attorney with Adams and Reese and a Tennessee State Senator, introduced a bill to the Tennessee Senate that would restrict the relief available to victims of nursing home abuse.  As Mr. Pera states in his declaration, his expert services are being compensated by plaintiffs' counsel, not by anyone in the nursing home industry.  (Pera Decl. ¶ 5(a)).  Mr. Pera has never discussed this case with Mr. Norris, whose activities as a Tennessee State Senator "are not undertaken as a part of his law practice or on behalf of Adams and Reese, LLP, but as a private citizen and as the elected representative of his constituents in West Tennessee." (Id. ¶ 5(b)).  There is simply no basis to disqualify the Watson firm based on its expert's alleged "connections" to the nursing home industry.

Next, the defendants argue generally – without providing any details or evidentiary support – that the Watson firm has violated TRPC 4.4 and 1.7 by contacting the Wilkes firm's clients and encouraging them to discuss confidential terms of their settlement agreements.  In Mr. Watson's declaration filed with the court, he states that "[n]either I nor my partner have communicated with anyone who is not a client of our firm and encouraged them to disclose their settlement agreements to me or anyone else.  This

allegation [by the defendants] is simply false." Because the defendants have not provided any support for their allegation, the court cannot find any violations of TRPC 4.4 and 1.7.

Finally, the court finds that Mr. Watson did not violate TRPC 4.4 by contacting Blair Evans, an attorney who currently works at Baker Donelson and who worked for the Wilkes firm from September of 1999 through April of 2000. As an initial matter, contact with a defendant's former employee is not necessarily prohibited by the rules. See Lake v. Orgulf Transp. Co., No. 92-2255-Ml/A, 1993 WL 194096, at *3 (W.D. Tenn. May 24, 1993) (stating that "[a]s long as the employees interviewed by plaintiff's counsel are not corporate employees whose position gives them the legal authority to bind the corporate defendants, counsel for plaintiff may legitimately interview them"); Sherrod v. Furniture Ctr., 769 F. Supp. 1021, 1022 (W.D. Tenn 1991) (holding that "[Rule 4.2] does not apply to former employees and the plaintiff's counsel's ex parte contact with defendant's former employee is not in violation of [Rule 4.2]"); see also Smith v. Kalamazoo Ophthalmology, 322 F. Supp. 2d 883, 890 (W.D. Mich. 2004); Kitchen v. Aristech Chemical, 769 F. Supp. 254, 258 (S.D. Ohio 1991). Moreover, based on the declarations filed by Mr. Watson and Ms. Evans[14] setting forth their versions of their telephone conversation in December of 2006 , Mr.

---

[14]Ms. Evans's declaration was filed in connection with defendants' separately filed motion for sanctions.

Watson did not ask for and Ms. Evans did not reveal any attorney-client privileged communications, the terms of any confidential settlement agreements, or any of the Wilkes firm's "trade secrets." (Watson Decl. ¶¶ 17-18; Evans Decl. ¶¶ 8-11). Further, even though the telephone conversation did not include any disclosure of privileged communications involving Ms. Howard, because Ms. Howard is now represented by the Watson firm, any such disclosures to Mr. Watson would not have been improper.

**D.    Disqualification Based on TRPC 3.7.**

The defendants also claim that Mr. Burns is a necessary and material witness in the current case and must be disqualified. Without providing any evidentiary support for their argument, defendants state that "[a]s counsel for the nursing home defendants in the Patzsch case, Mr. Burns is a material witness to the order of the litigation, the claims made and the settlement agreement ultimately reached." (Defs. Mot. to Disqualify at 13). Under TRPC 3.7, "[a] lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness . . ." Tenn. Sup. Ct. R. 8, TRPC 3.7.

In his declaration, Mr. Burns describes his limited involvement in the Patszch Lawsuit as follows:

> 4.    On May 20, 2001 I [] became employed as an associate attorney at [the Glassman firm]. I worked as an associate attorney for the Glassman firm from May 21, 2001 until March 31, 2005 at which time I resigned and formed my current firm of Watson Burns, PLLC. . . .

-26-

6.   I have reviewed the pleading related to the *Patzsch* matter attached as Exhibit 2 by Wilkes & McHugh which contains my name as an attorney on the case.  However, I did not sign the pleading (Mr. Glassman signed my name on the certificate of service), and to my knowledge, I was never informed of the fact that my name had been placed on this pleading. . . .  I would also note that Exhibit 2 is a pleading that appears to have been drafted by Rebecca Adelman, another associate at the Glassman firm, based upon my examination of the pleading's electronic "footer."  The footer contained on Wilkes & McHugh's Exhibit 2 reads: "N:/ria/00-328/ans-mot2.dis."  Having worked at the Glassman firm, I understand that this is a computer directory path that indicates that this document was located on the "N" or network server directory, was drafted under Rebecca Adelman's (ria) computer directory and pertains to File No. 00-328, (00-328) which was the 328th file opened by the Glassman firm during the year 2000.  Ms. Adelman left the Glassman firm in or around the late Spring of 2001 and started her own firm known as the Law and Mediation Offices of Rebecca Adelman, PLC.  Thus, while I cannot be certain because I was not personally involved in and have no recollection of ever have reviewed this pleading, it appears that Exhibit 2 was actually drafted by Ms. Adelman for Mr. Glassman's review and signature or was initially drafted by Ms. Adelman and finalized by Mr. Glassman after Ms. Adelman's resignation from the firm. . . .

7.   In an effort to confirm my lack of involvement in the *Patzsch* case, I reviewed the publicly available Circuit Court file and logged onto the publicly available Shelby County Circuit Court website and accessed the docket sheet related to this case.  Attached hereto as Exhibit "A" is a true and correct copy of the docket sheet printout that I accessed and obtained from the Shelby Circuit Court website related to the *Patzsch* case.  It appears that the *Patzsch* lawsuit was originally filed on May 11, 2000.  This was one (1) year and ten (10) days before I even accepted and began employment with the Glassman firm.  The docket sheet also demonstrates that Wilkes & McHugh's Exhibit 2 was filed on June 13, 2001, only some twenty-three (23) days after I first started working at the Glassman firm.  Also, and maybe more importantly, the docket sheet demonstrates that on June 29, 2001 (a mere thirty-nine (39) days after I started working with the Glassman firm) Mr. Glassman and his firm withdrew entirely as counsel in the *Patzsch* case.  At

that time, Ms. Adelman (at her newly formed firm) took over as defense counsel for all defendants in the case. Based on the docket sheet, it appears that Ms. Adelman handled the defense of the case from June 29, 2001 through its conclusion when the case was "announced settled" and a consent judgment entered on September 4, 2002. This was one (1) year and three (3) months after the Glassman firm's withdrawal from the case. As a result, the matter was only handled by the Glassman firm for a grand total of thirty-nine (39) days during my employment with that firm. I suspect that this is precisely why I have no recollection whatsoever about this case and/or its underlying facts.

8. . . . I would point out that I have never talked with or met any person working for or associated with the defendants in the *Patzsch* case (American Health Centers, Inc, Resthaven Manor, Inc d/b/a Applingwood Health Care Center, Tennessee Health Management, Inc.) nor with any representative of any insurance carrier acting on their behalves. To the best of my knowledge, I have never performed any legal work of any nature for these defendants in any case. I have never had any conversation with (nor have I even formally met or been introduced to) any attorney or employee of Wilkes & McHugh in connection with the *Patzsch* case or any other case. . . . Simply put, I have never litigated any case for or against Wilkes & McHugh and have no knowledge of anything that occurred in the *Patzsch* litigation other than what appears on the docket sheet and other publicly available documents discussed herein. . . . In fact, my review of the circuit court file indicated that, after Wilkes and McHugh and Ms. Adelman informed the Court that their clients had settled the *Patzsch* case, a dispute arose as to the settlement in that case such that Wilkes & McHugh filed a Motion to Enforce the Settlement. (A true and correct copy of this pleading and its attached exhibits are attached hereto as Exhibit "B.") In filing its client's Motion to Enforce Settlement and its attached materials – none of which Wilkes & McHugh chose to place under seal in the Circuit Court's files – Wilkes & McHugh attached a number of letters to demonstrate the amount and nature of the settlement in the *Patzsch* case that had been agreed to by Ms. Adelman on her client's behalf. As the Court can see, the letters involve Ms. Adelman and her law firm as counsel for the Defendants in the *Patzsch* case with respect to the settlement. . . .

-28-

(Burns Decl. ¶¶ 4, 6, 7, 8). Thus, the uncontradicted evidence before the court demonstrates that Mr. Burns did not actively participate in the Patzsch Lawsuit, the Glassman firm handled the case for only thirty-nine days during Mr. Burns's employment with the firm, and shortly after the answer was filed, Rebecca Adelman left the Glassman firm and took the case with her. Burns did not sign any documents filed with court, he was not personally involved in preparing the answer, and has no recollection of even reviewing the pleading. Thus, Mr. Burns does not have any personal knowledge of that litigation that would make him a necessary witness in the current case. Perhaps most disturbing to the court is defendants' statement that Mr. Burns has information about the "settlement agreement ultimately reached," as the defendants knew or certainly should have known (since they acted as plaintiff's counsel of record in that case) that the case settled over one year *after* the Glassman firm had withdrawn as counsel and that Mr. Burns would not have any information pertinent to the settlement of that case.

**E.   Disqualification Based on TRPC 8.4 and Canon 3 of the TCJC**

Lastly, the defendants allege that the Watson firm encouraged others to violate the TRPC and the TCJC. Specifically, the defendants contend that the plaintiffs' expert on probate court practice and procedure, Harold G. Walter, improperly engaged in *ex parte* communications with Shelby County Probate Court Judge Robert

Benham and retired Probate Judge Donn Southern. These
communications are reflected in Mr. Walter's declaration attached
in support of plaintiffs' response in opposition to defendants'
motion to dismiss, which states in pertinent part as follows:

> 2.   I have practiced law in the Probate Court of Shelby
> County, Tennessee ("Probate Court") during my entire
> tenure as an attorney. During the last fifteen (15)
> years, I have practiced extensively in Probate Court,
> work which now constitutes approximately fifty percent
> (50%) of my total practice. . . . At the request of
> former Judge Donn Southern and current Judge Robert
> Benham, I have served as Special Probate Judge on
> occasions over the years while the sitting judges were
> absent from the Probate Court. I have been asked to
> serve and am serving as an expert witness in the above
> styled litigation concerning the legal practice and
> procedure observed by the Probate Court of Shelby County
> when an estate has been opened and is prosecuting a
> wrongful death/medical malpractice action in another
> Court.
>
> 3.   Judge Donn Southern served as Judge in Division 2 of
> the Shelby County Probate Court for seventeen (17) years,
> ending on August 31, 2006. Judge Robert Benham is
> presently the Judge of Division 1 of Probate Court and
> has served in this capacity for nine (9) years. . . .
>
> 6.   I have reviewed the PETITION TO APPROVE SETTLEMENT
> filed in the matter of the Estate of Bertha Lee Baker,
> Probate Docket No. C-000127 in the Probate Court of
> Shelby County, Tennessee and have reviewed the resulting
> ORDER APPROVING SETTLEMENT signed by Judge Southern on
> September 20, 2002. . . . I have reviewed the Petition
> and Order filed in the Bertha Lee Baker case with Judge
> Southern. He has confirmed that his Order did not
> approve the actual settlement amount or percentage of any
> attorney fee award, and did not approve a fee award
> pursuant to T.C.A. § 29-26-120 or any other act. He
> indicated that, in his judgment, approval of any medical
> malpractice attorney fee award related to the Bertha Lee
> Baker estate should have been accomplished in trial court
> where the wrongful death case was filed. . . .
>
> 8.   Pursuant to Fed. R. Evid., Rule 703, in order to

formulate my opinions as to Probate Court practices and procedures as contained herein, I recently had lengthy discussions with both Judge Southern and Judge Benham. They each confirmed that my understanding was correct. Each also confirmed to me that they are aware of the statutory one-third (1/3) attorney fee cap on medical malpractice claims in Tennessee.  They each acknowledged that the attorney fee award in an action involving a medical malpractice claim is statutorily (T.C.A. § 29-26-120) required to be awarded by the trial court and the fee in such a case could not exceed thirty-three and one third percent (33 1/3%).  Moreover, both Judges confirmed: (1) that approval of attorney's fees in actions involving medical malpractice claims are the responsibility of the trial court wherein the medical malpractice claim is actually pending, (2) that even if they had the authority to rule on such a fee request, they would never approve attorney's fees in excess of the statutory limitation contained in T.C.A. § 29-26-120, and (3) that none of the Orders signed by them and attached hereto [as Exhibit B] determined or approved any attorney fees, whether a specific dollar amount or as a percentage of the recovery.

(Walter Decl. ¶¶ 2,3,6,8).

Canon 3(B)(9) states that "[a] judge shall not, while a proceeding is pending or impending in any court, make any public comment that might reasonably be expected to affect its outcome or impair its fairness or make any nonpublic comment that might substantially interfere with a fair trial or hearing."  Tenn. Sup. Ct. R. 10, TCJC 3(B)(9).  Canon 3(B)(7) states, in relevant part, that "[a] judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding . . ."  Tenn. Sup. Ct. R. 10, TCJC 3(B)(7). TRPC 8.4(f) prohibits a lawyer from knowingly assisting a judge or

judicial officer in conduct that is a violation of applicable rules of judicial conduct, and TRPC 8.4(d) states that lawyers may not "engage in conduct that is prejudicial to the administration of justice."

The court submits that the defendants' allegations of judicial misconduct are not supported by the record.[15]  First, to the extent the defendants suggest that Mr. Walter is bound by the TCJC based on his prior temporary appointments as a Special Probate Judge, the TCJC provides that

> B.  Retired and Pro Tempore Judges.  For purposes of this section, a retired judge is one who is available for assignment but is not a Senior Judge.  A pro tempore judge is a judge who serves or expects to serve once or only sporadically on a part-time basis under a separate appointment for each period of service or for each case heard.  A retired judge and pro tempore judge need only comply with the following Canons and *then only while actually serving as a judge* . . . Canon 3B[.]"

Tenn. Sup. Ct. R. 10, Application of the Code of Judicial Conduct, Section B (emphasis added).  Mr. Walter, who falls under the definition of a pro tempore judge, could not have violated Canon 3B when he contacted Judges Benham and Southern because, based on the record before the court, there is no evidence that he was serving as a Special Probate Judge at the time he contacted Judges Benham

---

[15]As stated earlier, the court will assume for purposes of this report and recommendation that the defendants have standing to bring a motion to disqualify counsel based on an alleged violation of the TCJC.

and Southern.[16]   Judge Southern likewise could not have violated
Canon 3B when he spoke to Mr. Walter because, by that time, Judge
Southern had already retired.   Moreover, Mr. Walter's discussions
with Judge Southern regarding the Order Approving Settlement in the
Baker Lawsuit was not inappropriate because the case was not a
"pending" case.   Indeed, it appears based on the dates of the
orders approving settlement, that none of the cases identified in
Mr. Walter's declaration which were assigned to Judges Benham or
Southern were "pending" at the time that Mr. Walter discussed these
orders with the probate judges.   Therefore, the court finds that
the Watson firm has not violated TRPC 8.4 by "encouraging" others
to violate the judicial canons.

### III. RECOMMENDATION

For the reasons above, the court recommends that the motion to
disqualify counsel for plaintiffs be DENIED.

Respectfully submitted,

s/ Tu M. Pham
_____
TU M. PHAM
United States Magistrate Judge

---

[16]Plaintiffs retained Mr. Walter as an expert while preparing its
response to defendants' motion to dismiss filed January 3, 2007.
(Burns Decl. ¶ 12).   Mr. Walter's declaration, which is dated
January 30, 2007, refers to his "recent" discussions with Judges
Benham and Southern.   (Walter Decl. ¶ 8).   Thus, it appears that
Mr. Walter's discussions with those judges occurred sometime during
this time period.

November 8, 2007
_____

Date

**NOTICE**

ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN TEN (10) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C).  FAILURE TO FILE THEM WITHIN TEN (10) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.